UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/23/2020

---

U.S. Bank National Association, as Trustee for GSAMP
Trust 2007-HE1,

                      Plaintiff,

        –v–

Goldman Sachs Mortgage Company, L.P, *et al.*,

                  Defendants.

19-cv-2305 (AJN)

OPINION & ORDER

---

ALISON J. NATHAN, District Judge:

U.S. Bank National Association serves as the trustee for a trust containing a pool of mortgage loans used to back residential mortgage-backed securities. After U.S. Bank learned that many of the loans were "junk" loans that failed to meet applicable underwriting standards, it brought suit against the seller of the loans and an affiliated company created to deposit the loans in the trust—Goldman Sachs Mortgage Company, L.P. ("GSMC") and GS Mortgage Securities Corp. ("GSMSC").

The two defendants (collectively, "Goldman") move to dismiss. Goldman principally contends that the agreement through which it transferred loans to the trust forbids the trustee from suing to enforce the agreement without GSMSC's consent. It also contends that the agreement's exclusive remedy provision bars U.S. Bank's claims for damages. The Court disagrees, and so denies the motion except as to the failure-to-notify claims that U.S. Bank now abandons.

I.      **Background**

For purposes of this motion, the Court takes as true all factual allegations in U.S. Bank's

complaint, Dkt. No. 22, and draws all reasonable inferences in its favor.

In February 2007, Goldman entered into a Pooling and Servicing Agreement ("the PSA")

with U.S. Bank and other banking companies to securitize a pool of mortgages for sale as

residential mortgage-backed securities ("RMBSs").  Complaint ¶ 22.  In the typical process for

issuing RMBSs, a sponsor originates or acquires mortgage loans, creates a trust and a special-

purpose business entity to deposit the loans into that trust, and then transfers the mortgage loans

to the trust via the depositor.  *Id.* ¶ 17.  The trust then issues certificates backed by the mortgage

loans, which underwriters purchase and sell to investors.  *Id.* ¶¶ 17–18.  Investors, who lack

access to the files for individual loans held in trust, rely on the sponsor's representations and

warranties about the quality of the loans in the pooling and servicing agreement.  *Id.* ¶ 21.

Goldman's PSA followed this model.  GSMC, as sponsor, transferred about 3,625

mortgage loans to the GSAMP 2007-HE1 trust via GSMSC, as depositor.  The trust issued and

sold about $607,700,200 in certificates to investors.  *Id.* ¶ 25.  U.S. Bank later succeeded

LaSalle Bank as trustee of the trust.  *Id.* ¶ 22.

Under the PSA, "[t]he Depositor [GSMSC] . . . sells, transfers, assigns, sets over and

otherwise conveys to the Trustee [now U.S. Bank] for the benefit of the Certificateholders,

without recourse, all the right, title and interest of the Depositor in and to the Trust Fund, and

the Trustee on behalf of the Trust, hereby accepts the Trust Fund."  PSA § 2.01(a), Dkt. No. 22-

1, at 69.  The interest in the trust fund that GSMSC conveyed under the agreement "include[ed],

without limitation, the Mortgage Loans, the Assignment Agreements, the Representations and

Warranties Agreement, the Interest Rate Cap Agreement and the Interest Rate Swap

Agreement." *Id.* § 2.01(d), Dkt. No. 22-1, at 73.  That is, the PSA transferred all the depositor's rights in the trust fund to the trustee, including all rights in the underlying mortgage loans and in the other agreements annexed to the PSA.  *Id.*; *see* Complaint ¶ 33.

Among these other agreements was the Representations and Warranties Agreement between GSMC and GSMSC ("the RWA"), included as Exhibit S to the PSA.  The RWA requires GSMC to cure any breach of its warranty obligations that materially and adversely affects the value of the mortgage loans or the depositor's interest therein or to repurchase the adversely affected loan.  RWA § 3(a), Dkt. No. 22-1, at 231.  It designates cure or repurchase as the "sole remedy" for any breach of warranty.  *Id.* § 3(b), Dkt. No. 22-1, at 232.  Following its general provisions, the RWA sets out detailed warranties as to the quality of the mortgage loans transferred to GSMSC, spanning five exhibits and approximately fifty printed pages.  *See id.* Ex. I–V, Dkt. No. 22-1, at 234–285.

This lengthy list of warranties is central to the PSA, because potential investors lack the information to independently assess the quality of the individual mortgage loans held by the trust.  Complaint ¶ 21.  The Pooling and Servicing Agreement does not leave this obvious conclusion to subtext.  In the agreement's only statement of policy, it declares that "it is the policy and intention of the Trust to acquire only Mortgage Loans meeting the requirements set forth in this Agreement."  PSA § 2.01(e), Dkt. No. 22-1, at 73.  To further effectuate this policy, the PSA requires the depositor to "use reasonable efforts to assist the Trustee in enforcing the obligations of the Sponsor [GSMC] under the applicable Assignment Agreement and the Representations and Warranties Agreement."  *Id.* § 2.01, Dkt. No. 22-1, at 71.

Section 2.07 charges the trustee to enforce the rights of the trust under the RWA and allows the use of trust funds for enforcement actions as follows:

> "Upon discovery . . . of a breach of a representation or warranty made by . . . the Sponsor pursuant to the Representation and Warranties Agreement, the party discovering such breach shall give prompt written notice thereof to the other parties to this Agreement . . . .  The Trustee shall take such action, with the Depositor's consent, with respect to such breach under the applicable Assignment Agreement or the Representations and Warranties Agreement, as applicable, as may be necessary or appropriate to enforce the rights of the Trust with respect thereto.  In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities of the Trust Fund, and the Trustee shall be entitled to be reimbursed therefor out of the Collection Account."  PSA § 2.07, Dkt. No. 22-1, at 77.

U.S. Bank alleges that Goldman systematically betrayed its obligations under the PSA and RWA by turning a blind eye to indications that the mortgage loans it deposited in the trust were defective.  Complaint ¶¶ 59–83.  In a statement of facts adopted as part of a settlement with the U.S. Department of Justice, Goldman's parent company admitted that in many instances up to eighty percent of the loans it purchased and securitized never underwent due diligence review.  *Id.* ¶ 62 & n.6.  Employees of the company characterized its loans as "junk," "dogs," and "lemons."  *Id.* ¶ 66.  But the company continued to "waive in" loans it knew to be defective.  *Id.* ¶ 69.  As the complaint notes, many of Goldman's practices concerning the securitization of subprime mortgage loans are a matter of public record.  *Id.* ¶¶ 64–65 (summarizing findings of the Financial Crisis Inquiry Commission).

Following an investigation by a certificate holder, U.S. Bank notified Goldman in December 2018 of breaches as to at least 617 mortgage loans in the trust having a material and adverse effect on the value of the loans.  *Id.* ¶ 75.  GSMC refused to cure or repurchase the loans.  *Id.* ¶ 78.  U.S. Bank requested GSMSC's assistance in enforcing the cure or repurchase obligation as to those loans.  *Id.* ¶ 77; *see* Declaration of Christopher P. Johnson in Opposition to Defendants' Motion to Dismiss, Ex. 1, Dkt. No. 41-1.  In its letter to GSMSC, dated February 13, 2019, U.S. Bank stated that it would deem a failure to respond by February 15, 2019, as

consent to proceed with claims against GSMC to the extent that such consent was required. Johnson Decl., Ex. 1.  GSMSC never responded to that request and did not provide assistance in enforcing GSMC's warranty obligations.  Complaint ¶ 77.

U.S. Bank then filed suit in New York Supreme Court, and Goldman removed to this Court.  U.S. Bank claims in its complaint that GSMC breached its warranty obligations and that GSMSC failed to use reasonable efforts to assist the trustee in enforcing obligations to the trust. *Id.* ¶¶ 84–123.  U.S. Bank also claimed that both defendants breached obligations to notify it of defective loans, but abandons those claims now.  *See id.* ¶¶ 102–117; Plf. Br., Dkt. No. 40, at 24–25.  It seeks both specific performance of the repurchase obligation and damages on its claims for breach of warranty.

On May 22, 2019, after U.S. Bank filed a petition in Minnesota state court seeking approval to use trust funds to prosecute this action, GSMSC sent a letter to U.S. Bank stating that it did not consent to such use of the funds.  Johnson Decl., Ex. 3; *see also* Declaration of Richard A. Jacobsen in Support of Defendants' Motion to Dismiss, Ex. B ("TIP Order"), Dkt. No. 33-2, ¶ 17.  GSMSC declined to participate in the Minnesota action, and the court entered an order authorizing U.S. Bank to use trust funds in this litigation.  *Id.* ¶¶ 22–23.  The court did not express a view as to whether § 2.07 of the PSA required U.S. Bank to obtain GSMSC's consent before proceeding with an action seeking to enforce the PSA on behalf of the trust.  *Id.* ¶ 24.

At this stage of the proceedings, the parties' dispute centers on whether § 2.07 of the PSA requires U.S. Bank to obtain GSMSC's consent before bringing suit to enforce the rights of the trust under the PSA.  Goldman contends that § 2.07 grants GSMSC "unqualified consent rights" and empowers it to withhold consent "for any reason or for no reason at all."  Def. Br., Dkt. No.

32, at 7–10.  Thus, Goldman says, GSMSC's failure to respond to the February 13, 2019 letter and subsequent disapproval of the use of trust funds to prosecute this action bar U.S. Bank from enforcing the rights of the trust.  *See id.* at 9; *see also* Reply Br., Dkt. No. 43, at 5–6.  And if the PSA allows GSMSC to refuse consent to sue, Goldman continues, doing so cannot be a violation of its duty to use reasonable efforts to assist the trustee in enforcing the rights of the trust.  Def. Br. at 12–13.

Goldman also contends that the PSA's sole remedy provision precludes a claim for damages, and that punitive damages and attorneys' fees are unavailable.  *Id.* at 14–16.

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Litwin v. Blackstone Grp.*, L.P., 634 F.3d 706, 715 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  When determining whether a complaint states a claim, a court accepts as true all allegations in the complaint and draws all reasonable inferences in favor of the non-moving party.  *Id.*

"A federal court sitting in a diversity case will apply the substantive law of the forum state on outcome determinative issues."  *McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir. 1997).  This Court thus must follow decisions of the New York Court of Appeals on questions of New York law.  *Id.*  When the New York Court of Appeals has not authoritatively decided an issue, this Court is, as a general matter, "bound . . . to apply the law as interpreted by New York's intermediate appellate courts [absent] persuasive evidence that the New York Court of

Appeals . . . would reach a different conclusion." *Blue Cross & Blue Shield of New Jersey, Inc.*

*v. Philip Morris USA Inc.*, 344 F.3d 211, 221 (2d Cir. 2003) (first alteration in original) (quoting

*Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999)).  The Second Circuit has

applied state substantive law in diversity cases as to the availability of equitable remedies for

breach of contract.  *See, e.g.*, *Pyskaty v. Wide World of Cars*, LLC, 856 F.3d 216, 227 (2d Cir.

2017); *Beck Chevrolet Co. v. Gen. Motors LLC*, 787 F.3d 663, 680 (2d Cir. 2015).

## III.   Discussion

### A.   Depositor's Consent

Under New York law, "[t]he fundamental, neutral precept of contract interpretation is

that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records,*

*Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).  Courts look first to the unambiguous meaning of a

contract's terms.  *Id.*  However, "[o]ne portion of [a contract] should not be read so as to negate

another portion." *Bombay Realty Corp. v. Magna Carta, Inc.*, 790 N.E.2d 1163, 1165 (N.Y.

2003).  "The agreement must be 'read as a whole to determine its purpose and intent.'" *Natixis*

*Real Estate Capital Tr. 2007-HE2 v. Natixis Real Estate Holdings, LLC*, 50 N.Y.S.3d 13, 18

(App. Div. 2017) (quoting *W.W.W. Assoc., v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)).

The New York Court of Appeals has therefore rejected formalistic adherence to the literal

meaning of isolated phrases in a contract that would eviscerate the overall agreement's

contemplated purpose.  *See Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982);

*see also Greenwich Capital Fin. Prod., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (App. Div. 2010)

("[A] contract should not be interpreted to produce a result that is absurd, commercially

unreasonable or contrary to the reasonable expectations of the parties." (quoting *In re Lipper*

*Holdings, LLC*, 766 N.Y.S.2d 561, 562 (App. Div. 2003))).

The dispute here centers on a single sentence in § 2.07 of the PSA: "The Trustee shall take such action, with the Depositor's consent, with respect to such breach under the applicable Assignment Agreement or the Representations and Warranties Agreement, as applicable, as may be necessary or appropriate to enforce the rights of the Trust with respect thereto."  Dkt. No. 22-1, at 77.  In Goldman's view, the four words "with the Depositor's consent" grant GSMSC an unqualified right to refuse consent for any action by the trustee seeking to enforce the rights of the trust.

Goldman is hardly bashful about the sweeping effect of its proposed interpretation.  It concedes that the affiliation of GSMC and GSMSC is "clear on the face of the PSA."  Def. Br. at 9.  Nonetheless, it contends that GSMSC may veto any enforcement action by the trustee "for any reason or for no reason at all."  *Id.* at 7.  This unilateral veto right, under Goldman's view, would bar not only actions against GSMC—nominally a separate business entity from GSMSC—but also suits like this one, in which GSMSC is itself a defendant.

In support of this remarkable proposition, Goldman cites a line of cases holding that courts may not impose a "good faith and fair dealing" limitation to unambiguous contractual consent rights.  True enough.  But neither *Moran v. Erk*, 901 N.E.2d 187 (N.Y. 2008), nor *State Sreet Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158 (2d Cir. 2004), addressed whether particular contractual language created such rights in the first place.  In *Moran*, the New York Court of Appeals held that a real estate contract allowing either party's attorney to disapprove the contract before the closing date could not support a cause of action for a bad-faith disapproval.  *Moran*, 901 N.E.2d at 190–91.  In *State Street*, the Second Circuit held that a bank did not breach a contract prohibiting a defaulted debtor from selling assets without the bank's consent by withholding consent unreasonably.  *State Street*, 374 F.3d at 170.

In both cases, the contracts unambiguously stated that advance consent was a condition precedent to the relevant rights under the contract.  *See Moran*, 901 N.E.2d at 190 ("Where a real estate contract states that it is 'subject to' or 'contingent upon' the approval of each party's attorney, this language means what is says: no vested rights are created by the contract prior to the expiration of the contingency period." (citations omitted)); *State Street*, 374 F.3d at 170 ("Here, the Credit Agreements provided that neither Inverraz nor its Restricted Subsidiaries could sell their assets if Inverraz had defaulted on the loans.  As such, all the parties agree on appeal that the defendants could not have sold Cosayach's assets to SQM without State Street Bank's consent.").  The parties conceded that prior consent was a condition precedent.  The only question before those courts was whether the implied covenant of good faith and fair dealing supplied an extra-contractual limit on that condition.

This case differs from *Moran* and *State Street* in two important respects.  First, the four words Goldman points to fall far short of an unambiguous grant of unqualified consent rights. The PSA does not say that the trustee's right to enforce the trust's rights is "subject to" or "contingent upon" GSMSC's approval.  *Moran*, 901 N.E.2d at 190.  Nor does the PSA forbid the trustee from proceeding with enforcement activities generally with only a narrow exception when GSMSC consents.  *See State Street*, 374 F.3d at 170.  To the contrary, the PSA vests primary enforcement rights—and responsibility—with the trustee, to whom GSMSC assigned "all the right, title and interest in . . . the Representations and Warranties Agreement."  PSA § 2.01(d), Dkt. No. 22-1, at 73; *see id.* § 2.07, Dkt. No. 22-1, at 77.  Conditions precedent are disfavored under New York law, and so Courts will not find them without unambiguous "conditional" language reflecting "an event that must occur *before* performance of a contractual duty becomes due."  *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1099 (2d Cir. 1992)

(citations omitted); *see Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995); *see, e.g.*, *Moran*, 901 N.E.2d at 190.  Such "unmistakable language" is absent here.  *Oppenheimer*, 660 N.E.2d at 418 (quoting Restatement (Second) of Contracts § 229, cmt. a).

Second, the plaintiffs in *Moran* and *State Street* sought to impose an obligation of reasonableness or good faith when the contract at issue contained none.  *See Moran*, 901 N.E.2d at 190; *State Street*, 374 F.3d at 170.  In the context of those contracts, unqualified consent rights made perfect sense.  In *Moran*, both parties had equal rights to back out of the deal before closing; that is, neither party had any obligations under the contract before that date.  *Moran*, 901 N.Ed.2d at 189.  In *State Street*, the contract generally prohibited the debtor from selling assets after default.  *State Street*, 374 F.3d at 170.  Allowing a defaulted debtor to sell assets with the bank's consent was a limited exception tailored to protect the bank's bargained-for right to repayment.  *See id.*  Goldman offers no explanation of what plausible purpose the parties could have intended to serve by granting the depositor, which conveyed all rights under the RWA to the trustee, blanket discretion to veto suits to enforce those rights.

Unlike the agreements in *Moran* and *State Street*, the PSA imposes an express obligation of reasonableness on GSMSC with respect to enforcement actions undertaken by the trustee. The PSA requires the depositor to use "reasonable efforts" to assist the trustee in enforcing obligations under the RWA.  PSA § 2.01, Dkt. No. 22-1, at 71.  Goldman contends that these reasonable efforts relate only to GSMSC's obligations to convey title to the mortgage loans to the trust and not any other warranties contained in the RWA, but the Court disagrees.  Although the title of § 2.01 references "Conveyance of Mortgage Loans," separate provisions of that section set out distinct obligations of the depositor to use reasonable efforts to ensure relevant

10

loan and recording documents are delivered to the trust.  *Id.* § 2.01, Dkt. No. 22-1, at 69, 71.  The same section also includes the PSA's policy statement, declaring that "it is the policy and intention of the Trust to acquire only Mortgage Loans meeting the requirements set forth in this Agreement, including without limitation, including the requirement that no Mortgage Loan be a High Cost Mortgage Loan."  *Id.* § 2.01(e), Dkt. No. 22-1, at 73.  The obligation to reasonably assist enforcement efforts therefore appears, in this context, to encompass enforcement of "the obligations of the Sponsor under the . . . Representations and Warranties Agreement" more broadly.  *Id.* § 2.01, Dkt. No. 22-1, at  71.  Thus, the PSA itself imposes clear limits on GSMSC's discretion not present in *Moran* and *State Street*.

Only one case Goldman cites bears any factual similarity to this one.  In *Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon*, No. 16-cv-1597 (NRB), 2017 WL 1103033, at *3 (S.D.N.Y. Mar. 21, 2017), another court in this district held that issuers of collateralized debt obligations lacked standing to enforce the contractual rights of several RMBS trusts.  In the pooling agreements in *Triaxx*, the issuers had "[g]rant[ed] to the [CDO Indenture] Trustee . . . all of its right, title and interest in [the trust property and agreements].  *Id.* (third and fourth alterations in original).  That is, the issuers lacked standing because they had assigned all rights in the trust to the trustee, who was charged with enforcing the rights of the trust.  *Triaxx* did not involve a reserved consent right held by a depositor.  Instead, the court simply held that the person who possessed rights under the pooling agreement was the one authorized to enforce it.  The PSA here unambiguously grants the trustee "all the right, title and interest of the Depositor in and to the Trust Fund []including . . . the Representations and Warranties Agreement."  PSA § 2.01(d), Dkt. No. 22-1, at 73.  Like in *Triaxx*, both the primary rights and enforcement rights under the PSA lie with the trustee.

This case more closely resembles *Natixis*, 50 N.Y.S.3d at 18, in which the New York Appellate Division held that the securities administrator of an RMBS trust could enforce the rights of the trust notwithstanding contractual language that "the Securities Administrator shall take such actions as directed upon written direction from the Depositor." The court held that this language required the administrator to take action when the depositor so directed; that is, that the administrator "shall" take actions "directed." *Id.* It did not divest the administrator of the authority to otherwise act to enforce its rights under the pooling agreement. The structure of § 2.07 is identical. It instructs that the trustee "shall" take enforcement actions to which the depositor "consents." PSA § 2.07, Dkt. No. 22-1, at 77. Nothing in it suggests a limitation on the trustee's power to otherwise enforce the trust's rights under the PSA in its discretion. *See Natixis*, 50 N.Y.S.3d at 18.

If Goldman's proposed interpretation of § 2.07 is arguable when reading that section in isolation, it utterly collapses under the weight of the PSA's other provisions. GSMC's nearly fifty pages of loan warranties would be meaningless if its affiliate could veto any action to enforce them for no reason at all. GSMSC's obligation to reasonably assist the trustee's efforts to enforce those warranties would be meaningless if, as Goldman contends, categorically blocking all such efforts comports with that obligation. Goldman argues that four unelaborated words in § 2.07 functionally displace both these provisions. In light of the PSA's structure and its unambiguous statement of policy, this interpretation is absurd, commercially unreasonable, and contrary to any plausible expectation of the parties. *See Greenwich Capital*, 903 N.Y.S.2d at 348.

The Court therefore denies Goldman's motion as to U.S. Bank's claims for breach of contract.

### B.     Exclusive Repurchase Remedy

Under New York law, claims of even pervasive breaches of an RMBS pooling agreement fall within the scope of typical contractual provisions designating repurchase of defective loans as the sole remedy for breach.  *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1184 (N.Y. 2018); *Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 750 (N.Y. 2017). "[C]ourts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities.  Contract terms providing for a 'sole remedy' are sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed . . . ."  *Nomura*, 92 N.E.3d at 748 (internal citations omitted).

But the New York Court of Appeals has long recognized that contractual limitations on liability are unenforceable when they serve to exculpate a party from damages caused by grossly negligent conduct.  *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370 (N.Y. 1992).  At least two decision of the New York Appellate Division have applied this principle to allow claims for damages for breach of warranty in an RMBS pooling agreement notwithstanding a sole remedy provision, including after *Ambac* and *Nomura* were decided.  *See In re Part 60 Put-Back Litig.*, 93 N.Y.S.3d 269, 275 (App. Div. 2019); *Morgan Stanley Mortg. Loan Tr. 2006-13ARX v. Morgan Stanley Mortg. Capital Holdings LLC (ARX)*, 36 N.Y.S.3d 458, 463 (App. Div. 2016). At least one court in this district has followed *Sommer* to conclude that a sole remedy provision in an RMBS pooling agreement was voidable.  *See Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Capital Holdings LLC*, 289 F. Supp. 3d 484, 500 (S.D.N.Y. 2018).

13

The PSA unambiguously states that cure or repurchase is the "sole remedy" available for breaches of the RWA.  RWA § 3(b), Dkt. No. 22-1, at 232; *see also* PSA § 2.03(e), Dkt. No. 22-1, at 75.  U.S. Bank cannot, and does not, seriously contend that its claims for breach of the RWA fall outside the scope of the sole remedy provision.  The Court nonetheless concludes that U.S. Bank has plausibly alleged a claim for money damages for two independent reasons.

First, taking as true all factual allegations in the complaint and drawing all reasonable inferences in U.S. Bank's favor, U.S. Bank has plausibly alleged that application of the PSA's sole remedy provision would exculpate Goldman from liability for gross negligence in violation of New York public policy. This Court is bound to follow decisions of New York's intermediate appellate courts absent persuasive evidence that the New York Court of Appeals would decide the matter differently.  *Cross & Blue Shield of New Jersey*, 344 F.3d at 221.  New York's intermediate appellate courts have allowed such claims to proceed.  *See In re Part 60 Put-Back Litig.*, 93 N.Y.S.3d at 275; *ARX*, 36 N.Y.S.3d at 463.

Goldman contends that these decisions are irreconcilable with *Ambac* and *Nomura* and are marked for swift reversal.  The Court is not so sure.  *Ambac* and *Nomura* were cases of contract interpretation, not enforceability.  They held that a plaintiff could not evade a sole remedy clause, as a matter of contract interpretation, by pleading overarching "transaction-level" breaches rather than narrower "loan-level" breaches.  *See Ambac*, 106 N.E.3d at 1184; *Nomura*, 92 N.E.3d at 751.  Neither case addressed public policy limitations to enforceability.  That is not to say that the New York Court of Appeals might not someday repudiate *Sommer* in this context. Indeed, an appeal from the decision in *In re Part 60 Put-Back Litigation* is currently pending before that court.  *See* No. APL-2019-00127 (N.Y.).  However, Second Circuit precedent establishes a presumption in favor of adhering to the authoritative rulings of a state's

intermediate appellate courts absent persuasive reasons to depart from them. The Court sees no persuasive reason to do so here.

Second, *Ambac* and *Nomura* offered no guidance on another question that this Court has taken up at length before: what happens when an RMBS trust prevails on its claims for specific performance of an exclusive repurchase remedy, but specific performance is impossible? *See Ace Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Ass'n v. DB Structured Prod., Inc.*, 5 F. Supp. 3d 543, 553–55 (S.D.N.Y. 2014). In *Ace*, this Court held that where the equitable remedy of specific performance fails, "equity may award damages in lieu of the desired equitable remedy." *Id.* at 554 (quoting *Doyle v. Allstate Ins. Co.*, 136 N.E.2d 484, 486 (N.Y. 1956)). That is, even if U.S. Bank were limited to specific performance under the PSA, a monetary award would be available where that remedy was impossible. This may be the case for foreclosed or otherwise liquidated mortgage loans. *Compare Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.,* 19 N.Y.S.3d 1, 6 (2015), *aff'd as modified*, 92 N.E.3d 743 (N.Y. 2017), *with MASTR Asset Backed Sec. Tr. 2006-HE3 ex rel. U.S. Bank Nat. Ass'n v. WMC Mortg. Corp.*, No. 11-cv-2542 (JRT/TNL), 2012 WL 4511065, at *6 (D. Minn. Oct. 1, 2012). The New York Appellate Division has relied on similar reasoning in allowing claims for money damages in an RMBS case to proceed. *See In re Part 60 Put-Back Litig.*, 93 N.Y.S.3d at 275 ("The fact that monetary damages may be required in lieu of specific performance is further reason to permit the allegations of gross negligence to remain.").

U.S. Bank alleges facts supporting an inference of grossly negligent conduct, and Goldman does not dispute the adequacy of those allegations in its motion to dismiss. *See* Complaint ¶¶ 59–73, 79, 81. Further, the Court cannot ascertain at this time whether specific performance will be possible as to each allegedly defective loan and so whether a monetary

award may be available in equity.  The Court therefore denies Goldman's motion to dismiss as to U.S. Bank's claims for money damages.

### C.     Punitive Damages

New York law allows punitive damages for claims for breach of conduct only when those damages are necessary to vindicate a public right.  *New York Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995) (citing *Rocanova v. Equitable Life Assur. Soc'y*., 634 N.E.2d 940, 943 (N.Y. 1994)).  To obtain punitive damages on a contract claim, (1) the "defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature[;] . . . (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally."  *Id.* (citations omitted).

The New York Appellate Division allowed a claim for punitive damages to proceed on nearly identical allegations in *In re Part 60 Put-Back Litigation*.  It reasoned that misrepresenting the quality of mortgage loans underlying an RMBS offering constituted the independent tort of fraud and caused certificate holders—non-party members of the investing public—hundreds of millions of dollars in losses.  *See* 93 N.Y.S.3d at 275–76.  U.S. Bank alleges that Goldman deliberately misrepresented the quality of the mortgage loans with the purpose and effect of reasonably inducing investors to purchase RMBSs.  *See* Complaint ¶ 72.  That is, it alleges conduct that would be actionable as the independent tort of fraud.  *See In re Part 60 Put-Back Litig.*, 93 N.Y.S.3d at 275–76; *see also IKB Int'l S.A. v. Morgan Stanley*, 36 N.Y.S.3d 452, 455–56 (App. Div. 2016) (holding that plaintiff stated a claim for fraud based on misrepresentation of loan quality in an RMBS case).  As in *In re Part 60 Put-Back Litigation*, U.S. Bank alleges that the conduct was directed toward the trust, because those misrepresentations materially and adversely affected its interest in the mortgage loans, and that the conduct was part of a pattern

that cost non-party members of the public hundreds of millions of dollars in losses. *See* Complaint ¶¶ 7, 25–26, 59–73. Although an "ordinary" fraud and deceit case does not necessarily involve egregious conduct, "there may be a recovery of exemplary damages in fraud and deceit actions where the fraud, aimed at the public generally, is gross and involves high moral culpability." *Walker v. Sheldon*, 179 N.E.2d 497, 499 (N.Y. 1961). Taking all allegations in the complaint as true and drawing reasonable inferences in U.S. Bank's favor, U.S. Bank plausibly alleges a claim for punitive damages.

The Court therefore denies Goldman's motion to dismiss as to U.S. Bank's claims for punitive damages.

### D.    Attorneys' Fees

Under New York law, attorneys' fees are available in an action for breach of contract only where specifically authorized by the contract. *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 904 (N.Y. 1989). The PSA defines the repurchase price—that is, the amount GSMC must pay to repurchase a defective loan—to include "without limitation, expenses arising out of . . . the Trustee's . . . enforcement of the Sponsor's repurchase obligations." PSA § 1.01, Dkt. No. 22-1, at 61.

It is well-settled among New York's intermediate appellate courts that similar provisions in RMBS pooling agreements allow recovery of attorneys' fees. *See, e.g.*, *In re Part 60 Put-Back Litig.*, 93 N.Y.S.3d at 276; *Deutsche Bank Nat. Tr. Co. v. EquiFirst Corp.*, 63 N.Y.S.3d 348, 349 (App. Div. 2017); *Wilmington Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 58 N.Y.S.3d 358, 359 (App. Div. 2017); *U.S. Bank Nat. Ass'n v. DLJ Mortg. Capital, Inc. (DLJ)*, 34 N.Y.S.3d 428, 429 (App. Div. 2016).

None of the authority Goldman cites casts doubt on this line of cases.  *Waverly Mews Corp. v. Waverly Stores Associates*, 741 N.Y.S.2d 826 (App. Div. 2002), was a landlord–tenant case.  The contract there allowed the landlord to recover "all costs and expenses" in the event of the tenant's default, but said nothing about the costs of judicially enforcing the landlord's rights. *Id.* at 827.  In a line of cases dealing with indemnification contracts, on the other hand, New York courts have held that a provision providing for indemnification of attorneys' fees should ordinarily be construed only to apply to third-party claims, not to legal fees as between the parties to the contract.  *See, e.g.*, *Hooper*, 548 N.E.2d at 905; *see also Ambac*, 106 N.E.3d at 1186 (disallowing attorneys' fees in an RMBS case based on provisions providing for indemnification of third-party claims).  In contrast, the relevant provision of the PSA, like those in *DLJ* and its progeny, expressly requires the *sponsor* to pay expenses arising out of the trustee's enforcement of the *sponsor's* repurchase obligations.  Unlike an indemnification provision, PSA § 1.01 plainly contemplates expenses incurred in litigation between the parties to the contract.

The Court therefore denies Goldman's motion to dismiss as to U.S. Bank's claims for attorneys' fees.

### E.     Failure-to-Notify Claims

U.S. Bank does not contest dismissal of its third and fourth claims alleging that Goldman failed to notify it of defective loans.  *See* Opp. Br. at 24–25.  The Court therefore dismisses those claims.

### Conclusion

For the foregoing reasons, Goldman's motion to dismiss (Dkt No. 31) is GRANTED in part and DENIED in part.  U.S. Bank's third and fourth claims are dismissed with prejudice.

The motion for leave to file an amicus brief (Dkt. No. 46) is GRANTED.  U.S. Bank's letter motion for oral argument (Dkt. No. 42) is DENIED as moot.  The Court will set a status conference by separate order.

      SO ORDERED.

Dated: November 23, 2020
      New York, New York          _____

                                        ALISON J. NATHAN
                              United States District Judge