UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/10/22

| | |
|---|---|
| U.S. Bank National Association, as Trustee for GSAMP Trust 2007-HE1,<br><br>      Plaintiff,<br><br>    –v–<br><br>Goldman Sachs Mortgage Company, *et al.*,<br><br>      Defendants. | 19-cv-2305 (AJN) |
| U.S. Bank National Association, as Trustee for GSAMP Trust 2007-HE2,<br><br>      Plaintiff,<br><br>    –v–<br><br>Goldman Sachs Mortgage Company, *et al.*,<br><br>      Defendants. | 19-cv-2307 (AJN)<br><br>OPINION & ORDER |

ALISON J. NATHAN, District Judge:

  Before the Court in these two related cases is the motion for partial summary judgment filed by Plaintiff U.S. Bank National Association ("U.S. Bank"). U.S. Bank serves as the trustee of two trusts that pool thousands of mortgage loans used to back residential mortgage-backed securities ("RMBS"). Those loans were underwritten by the loans' sponsor, Goldman Sachs Mortgage Company ("GSMC") and were deposited into the trusts by GS Mortgage Securities Corp. ("GSMSC"). U.S. Bank filed this suit against the Defendants (collectively, "Goldman") after it discovered that many of the loans in the trusts allegedly failed to meet the applicable

underwriting standards. The Court in a prior Opinion & Order held that U.S. Bank's claims could proceed and that it could seek damages for Goldman's breach of its representations and warranties.

The present motion asks the Court to decide whether U.S. Bank may prove liability and damages at trial by extrapolating from a statistically significant sample of the total loans. Goldman argues that such proof is incompatible with the governing contracts or, at least, that the contracts do not unambiguously permit sampling as required to grant U.S. Bank's motion at this stage. For the following reasons, the Court DENIES U.S. Bank's motion.

I. Background

A. Factual background

The following facts are drawn from the parties' statements and counter-statements made pursuant to Local Civil Rule 56.1. *See* U.S. Bank Reply to 56.1 Statement, Dkt. No. 137 (hereinafter, "U.S. Bank 56.1" and "Goldman 56.1").[1]

In February 2007, Goldman entered into two Pooling and Service Agreements (collectively, "the PSA") with U.S. Bank to securitize a pool of mortgages into two trusts, Goldman Sachs Alternative Mortgage Products ("GSAMP") Trust 2007-HE1 and GSAMP 2007-HE2 (collectively, "the trusts"), for sale as RMBSs. U.S. Bank 56.1 ¶¶ 1–3. U.S. Bank was appointed trustee of the trusts. *Id.* ¶ 4. In an arrangement typical of RMBS transactions, GSMC acted as the sponsor of the trusts and acquired approximately 8,500 individual loans, worth approximately $1.7 billion, and GSMSC acted as depositor and conveyed the loans to the trusts. *Id.* ¶¶ 5, 20, 29. In the PSA, GSMSC transferred "all the right, title and interest of [GSMSC] in

---

[1] Unless otherwise noted, all docket citations refer to case number 19-CV-02305 (AJN).

2

and to the Trust Fund" to the trustee, U.S. Bank, including the rights derived from agreements annexed to the PSA. *Id.* ¶¶ 25, 34. After the trusts were established, "[t]he right[s] to receive trust income [were] parceled into certificates and sold to investors." *BlackRock Fin. Mgmt. Inc. v. Segregated Acct. of Ambac Assurance Corp.*, 673 F.3d 169, 173 (2d Cir. 2012).

Among the agreements that confer rights to U.S. Bank as trustee are the Representations and Warranties Agreement for each trust (collectively, "the RWA"), in which GSMC, as the sponsor, made a series of representations and warranties regarding the loans deposited into the trusts. *Id.* ¶¶ 20–21, 29–30; *see also id.* ¶ 26 (Section 2.03(b) of the PSA provides that "the representations and warranties set forth in this Section 2.03 shall survive the transfer of the Mortgage Loans by the Depositor to the Trustee, and shall inure to the benefit of the Depositor, the Servicer and the Trustee . . . .").[2] "This lengthy list of warranties is central to the PSA, because potential investors lack the information to independently assess the quality of the individual mortgage loans held by the trust." Opinion & Order at 3, Dkt. No. 72.

The RWA includes several provisions that address GSMC's obligations in the event that loans breached the representations and warranties. Section 3(a) of the RWA states:

> Within sixty (60) days of the earlier of either discovery by or notice to GSMC of any breach of a representation or warranty which materially and adversely affects the value of the Mortgage Loans or the interest of the Depositor therein (or which materially and adversely affects the value of the applicable Mortgage Loan or the interest of the Depositor therein), GSMC shall cure such breach in all material respects and, if such breach cannot be cured, GSMC shall, at the Depositor's option, within sixty (60) calendar days of GSMC's receipt of request from the Depositor, repurchase such Mortgage Loan at the Repurchase Price. In the event that such a breach shall involve any representation or warranty set forth in Section 2 of this Agreement, and such breach cannot be cured within sixty (60) days of the earlier of either discovery by or notice to GSMC of such breach, all of the Mortgage Loans materially and adversely affected thereby shall, at the

---

[2] The two RWAs are, for present purposes, identical. The Court will cite to the HE1 RWA as a "representative statement" of Goldman's obligations. Goldman Br. at 5 n.2.

> Depositor's option, be repurchased by GSMC at the Repurchase Price. Notwithstanding the above sentence, within thirty (30) days of the earlier of either discovery by, or notice to, [GSMC] of any breach of the representations or warranties set forth in clauses (t), (x), (bb), (cc), (dd) and (ff) of Exhibit VII, [GSMC] shall repurchase the affected Mortgage Loan or Mortgage Loans at the Repurchase Price, together with all expenses incurred by the Depositor as a result of such repurchase.

U.S. Bank 56.1 ¶ 22.[3]

And Section 3(b) provides:

> It is understood and agreed that the obligation of GSMC set forth in Section 3(a) to repurchase or substitute for a Mortgage Loan in breach of a representation or warranty contained in Section 2 constitutes the sole remedy of the Depositor or any other person or entity with respect to such breach.

*Id.* ¶ 23.

The PSA defines the repurchase price that GSMC must pay to the trust to repurchase breaching loans as the following:

> With respect to any Mortgage Loan, (a) repurchased by the Sponsor, an amount equal to the sum of (i) the unpaid principal balance of such Mortgage Loan as of the date of repurchase, (ii) interest on such unpaid principal balance of such Mortgage Loan at the Mortgage Interest Rate from the last date through which interest has been paid and distributed to the Securities Administrator to the date of repurchase, (iii) all unreimbursed Servicing Advances, (iv) all expenses incurred by the Servicer, the Master Servicer, the Trust or the Trustee, as the case may be, in respect of a breach or defect, including, without limitation, expenses arising out of the Servicer's, the Master Servicer's or the Trustee's, as the case may be,

---

[3] A similarly worded repurchase obligation is also contained in several agreements that govern the GSAMP Trust 2007-HE1. Section 9 of an Assignment, Assumption and Recognition Agreement, for example, provides:

> The Assignor hereby acknowledges and agrees that in the event of any breach of the representations and warranties made by the Assignor set forth in Section 8 hereof that materially and adversely affects the value of any Mortgage Loan or the interest of the Assignee or the Trust therein within 60 days of the earlier of either discovery by or notice to the Assignor of such breach of a representation or warranty, it shall cure, purchase or cause the purchase of the applicable Mortgage Loan at the Repurchase Price set forth in the Pooling Agreement.

Am. Compl., Ex. 1 at 338, Dkt. No. 83.

> enforcement of the Sponsor's repurchase obligations, to the extent not included in clause (iii), and (v) any costs and damages incurred by the Trust in connection with any violation by such Mortgage Loan of any predatory lending law or abusive lending law, and (b) repurchased by Aames, the "Repurchase Price" as defined in the Aames Purchase Agreement, repurchased by NovaStar, the "Repurchase Price" as defined in the NovaStar Purchase Agreement, repurchased by First Horizon, the "Repurchase Price" as defined in the First Horizon Purchase Agreement or repurchased by Decision One, the "Repurchase Price" as defined in the Decision One Purchase Agreement, as applicable.

*Id.* ¶ 24.

The PSA also imposes an obligation that "[u]pon discovery by any of the parties hereto of a breach of a representation or warranty . . . , the party discovering such breach shall give prompt written notice thereof to the other parties to this Agreement . . . . The Trustee shall take such action, with the Depositor's consent, with respect to such breach under the applicable Assignment Agreement or the [RWA], as applicable, as may be necessary or appropriate to enforce the rights of the Trust with respect thereto." *Id.* ¶ 27 (quoting Section 2.07 of the PSA); see also *id.* ¶ 26 (Section 2.03(b) of the PSA similarly requires that "[u]pon discovery by any of the Depositor, the Master Servicer, the Securities Administrator, the Trustee, each Custodian or the Servicer of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the others.").

On December 21, 2018, and January 18, 2019, U.S. Bank received notifications from investors in the trusts that at least 617 loans in the GSAMP Trust 2007-HE1 and 1,041 loans in the GSAMP Trust 2007-HE2 materially breached one or more of the representations and warranties. *Id.* ¶¶ 37–38. Soon after, U.S. Bank notified GSMC of the investors' letters and it demanded that GSMC cure the breaches or repurchase all identified breaching loans as well as any other defective loans in the trusts. *Id.* ¶¶ 40–42. Since these demands were made, GSMC has not cured any breaches or repurchased any loans in the trusts. *Id.* ¶ 43.

5

B. **Procedural history**

U.S. Bank filed this action against Goldman in New York Supreme Court, and Goldman removed it to this Court. In its amended complaint dated January 14, 2021, U.S. Bank claims that Goldman willfully failed to comply with its obligation to cure or repurchase defective loans. Am. Compl. ¶¶ 1–8. U.S. Bank alleges that "defects are likely pervasive throughout" the trusts and go beyond those loans specifically identified in the investors' letters. *Id.* ¶ 9. It seeks both the specific performance of Goldman's repurchase obligation and damages on its claims for breach of contract. The Court on November 23, 2020, denied Goldman's motion to dismiss the action. Dkt. No. 72. At a June 28, 2021 conference, the Court granted U.S. Bank leave to file this motion for partial summary judgment, which U.S. Bank filed in both cases on July 28, 2021, U.S. Bank Br., Dkt. No. 117, and which is fully briefed, Goldman Br., Dkt. No. 127; U.S. Bank Reply, Dkt. No. 138.

U.S. Bank's motion requests that the Court hold that U.S. Bank "may rely on statistical sampling of loans to prove liability and damages at trial." U.S. Bank Br. at 21. Its proposed method of sampling is as follows. First, U.S. Bank's retained expert Dr. Karl Snow will determine a random sample of 400 loans from each loan group in each trust, for a total of 800 loans per trust and 1,600 loans total. U.S. Bank 56.1 ¶¶ 57, 60–63. Dr. Snow will draw only from loans with at least $100 in losses and that have been liquidated, which is defined as loans that have defaulted and been charged off, thereby exiting the trusts. *Id.* ¶¶ 58–59. As of December 28, 2020, 4,305 of the roughly 8,500 loans in the trusts were liquidated loans. *Id.* ¶¶ 60–61. For active loans that U.S. Bank alleges to be defective, U.S. Bank will offer loan-by-loan proof of liability and damages. U.S. Bank Br. at 7.

Second, U.S. Bank's retained expert Robert Hunter will reunderwrite the selected active loans and the 1,600 randomly selected liquidated loans. U.S. Bank 56.1 ¶¶ 64–66. The process of reunderwriting requires Hunter to compare each loan to the warranties made, including by examining the borrower, the loan, and the mortgaged property as to each loan. *Id.* ¶ 65; *see also* Goldman 56.1 ¶ 20 ("Loan underwriting is a borrower-specific endeavor, which focuses on the particular characteristics of the borrower, loan, and property."). And, as required to trigger GSMC's repurchase obligation, Hunter will determine whether breaches of the representations and warranties "materially and adversely affects the value of the Mortgage Loans or the interests of the Trusts." Hunter Decl. ¶ 2, Dkt. No. 120. Making these determinations requires that Hunter have the relevant loan documents and that those documents be correctly matched to the particular loan. U.S. Bank 56.1 ¶¶ 66–67. The parties agreed to matching protocols under which Goldman is able to match 300 loans each month. *Id.* ¶¶ 67–68.

Third, after reunderwriting, Hunter and other experts will determine from the 1,600 randomly selected liquidated loans the "breach rate" of defective liquidated loans. U.S. Bank Br. at 9. Dr. Snow will then extrapolate the breach rate to each trust's two loan groups and then calculate the damages owed. *Id.*; *see* Snow Decl., Dkt. No. 119. In sum, U.S. Bank's proposal would require reunderwriting roughly 2,700 fewer loans than would a loan-by-loan process, which, it says, would shorten discovery by approximately 20 months. U.S. Bank Br. at 9.

The parties agree that whether U.S. Bank is permitted to offer this proof of Goldman's liability and damages owed under the PSA and RWA is a question of contract law. *See* U.S. Bank Br. at 10. Whether U.S. Bank's sampling methodology is reliable and would satisfy, for example, Federal Rule of Evidence 702, is a separate question that would be presented in a later pretrial motion. *See* U.S. Bank Br. at 9 n.9.

## II.   Legal Standard

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "[I]n making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion."  *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995).

When presented with a contract claim, "a court may grant summary judgment 'only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning.'"  *N.Y.C. Transit Auth. v. Express Scripts, Inc.*, No. 19-CV-5196 (JMF), 2022 WL 603937, at *5 (S.D.N.Y. Mar. 1, 2022) (quoting *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)); *see also Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("However, when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." (quoting *Ruttenberg v. Davidge Data Sys. Corp.*, 626 N.Y.S.2d 174, 175 (1st Dep't 1995))).

New York law governs the present dispute.  *See Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 124 (2d Cir. 2019).  In New York, ambiguity "is defined in terms of whether a reasonably intelligent person viewing the

contract objectively could interpret the language in more than one way." *Topps*, 526 F.3d at 68 (citing *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)). And, under New York law, "a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007)). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Id.* (ultimately quoting *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)).

### III. Discussion

Applying New York principles of contract law, the Court must interpret the PSA and RWA, which govern the present dispute, "so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Porco v. Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) (quoting *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000)). Neither contract speaks directly to the permissibility of proof by sampling. From the absence of an express prohibition, U.S. Bank asks that the Court find an unambiguous authorization of sampling. But the governing contracts are not silent as to how the parties are to prove breach of the representation or warranties, to prove that breach materially and adversely affects the value of a loan, or to prove the repurchase price that GSMC must pay.

At each step, the contractual language describes a loan-specific procedure. Start with the language defining breach and material-and-adverse effects in the RWA. It states that once notified of a breach, "GSMC shall cure *such* breach in all material respects and, if *such* breach cannot be cured, GSMC shall . . . repurchase *such* Mortgage Loan at *the* Repurchase Price." U.S. Bank 56.1 ¶ 22 (emphases added); *see also id.* (referring, further, to "such a breach," "the

9

Repurchase Price," and "such repurchase"). And to trigger GSMC's repurchase obligation, a breach of a representation or warranty must materially and adversely affect the particular loan's value. *Id.* This determination in the underwriting and reunderwriting process is necessarily loan-specific. The parties dispute whether underwriting can be considered a subjective or objective inquiry. *See* Goldman 56.1 ¶¶ 19–23. But U.S. Bank does not dispute that the informational inputs change from loan to loan, including the loan's originator, the borrower, and the property that was mortgaged.

Further, the remedies available to U.S. Bank under the RWA in the event of breach are loan-specific. If Goldman does not cure a breach, it must "repurchase or substitute for a Mortgage Loan in breach of a representation or warranty." U.S. Bank 56.1 ¶ 23. Here, U.S. Bank seeks damages "in the amount of the Repurchase Price." U.S. Bank Br. at 12. Like breach and material-and-adverse effect, the PSA defines the repurchase price in the singular as to "any Mortgage Loan." U.S. Bank 56.1 ¶ 24. And the repurchase price depends on the individual loan, as it is a function of characteristics specific to that loan, including the unpaid principal balance, the mortgage rate, unreimbursed servicing advances, and additional expenses incurred by the parties. *Id.*

In short, the contractual language consistently speaks in "singular terms"—that is, "*a* breach event, *the* offending loan, and *the* repurchase price." *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 12 CIV. 5067 (JFK), 2017 WL 5256760, at *7 (S.D.N.Y. Nov. 13, 2017) (emphasis added). That singular language fits within a remedial structure "that generally calls for proof of breach on a loan-by-loan basis." *Id.* The Court concludes that this contractual language and structure cannot provide a wholly unambiguous basis for permitting U.S. Bank's proposed proof by sampling. *See id.* ("Precisely defining these terms in connection with a

10

sophisticated remedial scheme makes little sense if [the trustee] may use statistical means to 'prove' that a loan is in breach without actually identifying the specific loan (and specific breach)."); *see also MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, No. 12-CV-7322 (PKC), 2015 WL 764665, at *11 (S.D.N.Y. Jan. 9, 2015) ("*MARM 2006-OA2 I*") ("Thus, the repurchase mechanism established by the parties is targeted to a specific loan, and not to a group or category of loans.").

U.S. Bank first responds by drawing the distinction that its proposal, unlike some prior RMBS sampling cases, is limited to sampling of liquidated loans, meaning that damages are purely a function of the aggregated repurchase price of all defective loans and no liquidated loan will actually be reacquired by Goldman. U.S. Bank Br. at 12–13. This concession in U.S. Bank's proposal, however, does not make a difference as to the arguments Goldman has raised in this case. The rub, in Goldman's telling, is not that the remedy requires the transfer of individual loans back to Goldman at the time of repurchase. Rather, it is that the procedure for identifying a breach, determining whether that breach was material, and calculating the repurchase price to be paid is, at each step, a loan-specific one, whether the loan is active or liquidated.

The primary response in U.S. Bank's briefing is not an argument about the relevant contractual language but instead an appeal to the large body of federal and state cases that interpret similar language in RMBS contracts and that, U.S. Bank says, overwhelmingly favor its position. The Court has considered each set of cases and finds that available precedent is not so clean cut as U.S. Bank suggests, nor does it persuade the Court to depart from its conclusion that the contracts here do not unambiguously support U.S. Bank's position.

*First*, courts in this district are split on whether sampling is permitted when an RMBS trustee sues a sponsor. The courts in *Homeward* and *MARM 2006-OA2*, after reading the

11

contractual terms as this Court has, concluded that sampling is not permitted. *Homeward*, 2017 WL 5256760, at *1 ("[T]he Court concludes that the governing agreements, as relevant here, call for proof of breach on a loan-by-loan basis . . . ."); *MARM 2006-OA2 I*, 2015 WL 764665, at *11 (concluding that "the repurchase remedy negotiated by the parties is loan specific"); *see also MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, No. 12-CV-7322 (PKC), 2015 WL 797972, at *3 (S.D.N.Y. Feb. 25, 2015) ("*MARM 2006-OA2 II*") ("Summary judgment was denied because plaintiffs' theories and expert sampling data did not align with the materiality requirement of the parties' agreements."). Two other courts, *Flagstar* and *MSST 2007-1*, reached the opposite conclusion. *See Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013); *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484, 502–05 (S.D.N.Y. 2018) ("*MSST 2007-1*").[4]

The Court is not persuaded by these latter opinions. The premise at the heart of each is that "[s]ampling is a widely accepted method of proof in cases brought under New York law" and, further, that sophisticated random sampling is capable of accurately reflecting a large RMBS trust "despite the unique characteristics of the individual members populating the underlying pool." *Flagstar*, 920 F. Supp. 2d at 512; *accord MSST 2007-1*, 289 F. Supp. 3d at 505 ("Thus, proper statistical sampling is not a shot in the dark—it is a well-established and scientifically sound method of inferring (to varying degrees of certainty) how many *individual* loans in the pool contain material breaches."). But the soundness of U.S. Bank's experts'

---

[4] U.S. Bank also cites out-of-district cases that favorably cite *Flagstar*. *E.g.*, *Law Debenture Tr. Co. of N.Y. v. WMC Mortg., LLC*, No. 3:12-CV-1538 (CSH), 2015 WL 9581729, at *7 (D. Conn. Dec. 30, 2015); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021 (C.D. Cal. 2013).

methods is not in question. The results of their methods may well be reliable and admissible under Federal Rule of Evidence 702, but that does not address whether, as a preliminary matter, the relevant contracts unambiguously permit such proof of U.S. Bank's claims. *See MARM 2006-OA2 II*, 2015 WL 797972, at *2. As explained, they do not.[5]

*Second*, by contrast, courts in this district have "uniformly" held that if *investors* sue an RMBS trustee, "liability and damages must be established 'loan by loan.'" *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-04394 (AJN) (BCM), 2018 WL 4682220, at *9 & n.20 (S.D.N.Y. Sept. 28, 2018) (collecting five cases). U.S. Bank insists that these cases are "fundamentally different" because while a sponsor has a duty to the trustee to investigate loans for defects, a trustee has a duty to investors only if it has actual knowledge that a loan is defective. U.S. Bank Reply at 6; *see, e.g.*, *Deutsche Bank Nat'l Tr.*, 2018 WL 4682220, at *7 (requiring a trustee's "actual knowledge" of breach). And, these courts have uniformly held, a trustee's actual knowledge of a particular defective loan cannot be proven by extrapolating from a sample of other loans. To be sure, all of these courts' decisions recognize this "important" difference between trustee-sponsor suits and investor-trustee suits. *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, No. 14-CV-2590 (VM) (RWL), 2018 WL 3350323, at *3 (S.D.N.Y. July 9, 2018), *aff'd*, 349 F. Supp. 3d 282 (S.D.N.Y. 2018).

But the reasoning in these decisions is not confined to the actual-knowledge distinction on which U.S. Bank relies. Rather, these cases also emphasize the same contractual language

---

[5] The *MSST 2007-1* court also reasoned that the trustee need not provide loan-by-loan proof because the monetary damages the trustee sought are "completely fungible." 289 F. Supp. 3d at 502. But this argument, even accepted as true, does not address the loan-specific procedure of first proving breach and material-and-adverse effect as to each loan. Further, while the damages are fungible once aggregated and paid to the trustee, the repurchase formula that determines those damages requires consideration of individual loans' characteristics.

that Goldman here emphasizes to require loan-by-loan proof of a sponsor's liability and damages. For example, one decision explains that sampling is not permitted because "under the language of the relevant agreements governing the trusts, the sole remedy provided to the trustee with regard to breaching loans is to seek repurchase on a loan-by-loan, trust-by-trust basis. In other words, whether and to what extent a trustee can obtain repurchase of breaching loans must be determined separately for each specific loan." *Id.* at *2. Another explains, citing repeatedly to *MARM 2006-OA2 I*, that breach is loan-specific, materiality of breach is loan-specific, and "the cure and repurchase remedies . . . are themselves loan specific." *BlackRock Allocation Target Shares v. Wells Fargo Bank, Nat'l Ass'n*, No. 14-CV-09371 (KPF) (SN), 2017 WL 953550, at *5 (S.D.N.Y. Mar. 10, 2017). Similar reasoning—which has nothing to do with the actual-knowledge requirement for trustees—runs throughout the other investor-trustee opinions that prohibit sampling. *E.g.*, *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, No. 14 CIV. 10101 (LGS), 2018 WL 11366956, at *2 (S.D.N.Y. Feb. 23, 2018) (explaining that once a trustee has knowledge of a breach, it "must request that the seller cure the defect or breach, and if the seller does not, the trustee must require the seller to repurchase the loan," all of which requires "loan-specific information"); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 713 (S.D.N.Y. 2016) ("To prevail ultimately on the breach of contract claim, a plaintiff does have to demonstrate breach on a loan-by-loan and trust-by-trust basis." (cleaned up)); *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 389 (S.D.N.Y. 2017).

*Third*, the Court's conclusion is not altered by U.S. Bank's observation that every state court to consider the permissibility of sampling in RMBS cases has approved of the practice. U.S. Bank Br. at 11 n.10; *see, e.g.*, *Ambac Assurance Corp. v. Countrywide Home Loans Inc.*,

179 A.D.3d 518, 521 (1st Dep't 2020); *Morgan Stanley Mortg. Loan Tr. 2006-14SL v. Morgan Stanley Mortg. Cap. Holdings, LLC*, Index No. 652763/2012, Doc. No. 241, Hr'g Tr. at 49–52 (N.Y. Sup. Ct. June 30, 2017); *SACO I Tr. 2006-5 v. EMC Mortg. LLC*, Index No. 651820/2012, Dkt. No. 564, Hr'g Tr. at 14–17 (N.Y. Sup. Ct. Dec. 2, 2015); *ACE Sec. Corp. v. DB Structured Prod., Inc.*, 981 N.Y.S.2d 633 n.3 (Sup. Ct. 2013); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 39 Misc. 3d 1220(A) (N.Y. Sup. Ct. 2013); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 958 N.Y.S.2d 647 (Sup. Ct. 2010). Because this case arises from diversity jurisdiction, the Court must apply "the law of New York as interpreted by the New York Court of Appeals." *Lehman*, 916 F.3d at 124 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 48 (2d Cir. 2013) (per curiam)). But that principle requires that the Court apply New York's substantive contract law. It does not dictate how the Court must interpret particular contractual language that has also been interpreted, in other contracts, by New York's courts.

Moreover, there is "persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion" than that reached by the only intermediate appellate court to have ruled. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 221 (2d Cir. 2003) (quoting *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999)). In *Ambac*, the First Department's full discussion consists of one sentence: "While the motion was not procedurally barred, we find that despite the language of the repurchase protocol, RMBS plaintiffs like Ambac are entitled to introduce sampling-related evidence to prove liability and damages in connection with repurchase claims." 179 A.D.3d at 521 (citing *Flagstar*, *MARM-OA2 I*, and *Fed. Hous. Fin. Agency for Fed. Natl. Mtge. Assn. v Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir 2017)). That terse explanation runs

directly counter to the New York Court of Appeals' latest word on contractual remedies in RMBS cases, where the court reversed a First Department decision, explaining that its cases stand for the consistent principle that "the parties' contract, as written, means what it says." *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 348 (2020). Particularly in light of this post-*Ambac* decision, the Court finds that the New York Court of Appeals is unlikely to follow *Ambac*'s holding made "without discussion" and would instead "likely agree with the reasoned analysis set forth in cases" like *Homeward* and *MARM-OA2 I*. *Stillman v. InService Am., Inc.*, 455 F. App'x 48, 51 (2d Cir. 2012) (summary order).

Last, U.S. Bank argues that loan-by-loan proof of liability and damages for all 4,305 liquidated loans would "waste extraordinary amounts of time and money." U.S. Bank Br. at 20; *see also MSST 2007-1*, 289 F. Supp. 3d at 502 (concluding that "loan-by-loan re-underwriting and analysis is impracticable given the scope of the alleged breach in this action"). The Court observes that denying sampling here would increase the number of loans that must be reunderwritten from 1,600 to 4,305. That increased burden is significant, but not prohibitive. But even if U.S. Bank's concerns were well founded, they could not change the Court's interpretation of the contracts. The Court must give effect to the language and provisions agreed to by the parties. *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002). Sophisticated parties could "have bargained for a broader obligation to repurchase the entire pool of loans under specified circumstances. These parties did not." *MARM 2006-OA2 I*, 2015 WL 764665, at *11. When the contract is the product of "an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns[,] there is no reason to relieve them of the consequences of their bargain," even if those consequences are costly or inconvenient. *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 355 (quoting *Oppenheimer & Co.*

16

*v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (1995)). The Court therefore does not find the relevant contractual language "to be wholly unambiguous and to convey a definite meaning" as is U.S. Bank's burden to prove to prevail. *Topps*, 526 F.3d at 68.

Finally, the Court notes two issues that it does not resolve. First, Goldman contends that regardless of the current contracts' meaning, U.S. Bank should be judicially estopped from arguing for sampling now because in prior cases where it was sued as an RMBS trustee, it successfully argued that sampling was not permitted. Goldman Br. at 12–13. Because the Court concludes that the contractual language is not wholly unambiguous in support of U.S. Bank's position, the Court need not address this alternative basis for rejecting U.S. Bank's interpretation. Second, both parties' briefs discuss whether U.S. Bank's demand that Goldman repurchase "any other defective Loans" in the trusts satisfied the RWA's notice requirement, U.S. Bank 56.1 ¶ 40, and if not, whether the notice requirement is a prerequisite to filing suit, U.S. Bank Br. at 20–21; Goldman Br. at 22–23. They agree, however, that the Court need not resolve this issue now and they note that the New York Court of Appeals may soon offer instructive guidance on the issue. U.S. Bank Reply at 10; Goldman Br. at 23 & n.9; *see U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*, 169 N.E.3d 246 (N.Y. 2021) (granting reargument on what satisfies notice of breach by an RMBS sponsor).

**IV.   Conclusion**

For the foregoing reasons, U.S. Bank's motion for partial summary judgment is DENIED. Dkt. No. 117. The Court also DENIES the parties' requests for oral argument on the motion. Dkt. Nos. 124, 131. Within two weeks of the date of this Opinion & Order, the parties are ordered to file a revised case management plan.

17

In case number 19-cv-2305, this resolves docket numbers 117, 124, and 131. In case number 19-cv-2307, this resolves docket numbers 93, 100, and 108.

SO ORDERED.

Dated: March 10, 2022
New York, New York

_____
ALISON J. NATHAN
United States District Judge